UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

EMIRAT AG,

        Plaintiff,

      v.                          Case No.  12-C-0789

HIGH POINT PRINTING LLC,
WS PACKAGING GROUP, INC.,

        Defendants,

CINCINNATI INSURANCE CO.,

        Intervening Plaintiff,

      v.

EMIRAT AG and
WS PACKAGING GROUP, INC.,

        Defendants in Intervention.

---

DECISION AND ORDER DENYING EMIRAT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 71) AND GRANTING WS PACKAGING'S MOTION FOR SUMMARY JUDGMENT (DOC. 68)

      In this diversity action, Emirat AG sues WS Packaging Group, Inc. and High Point Printing LLC over the allegedly defective printing of combination game and telephone-use scratch-off cards.   Emirat and WS Packaging have filed cross-motions for summary judgment.

      Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

FACTS[1]

Emirat AG is a foreign corporation registered in Germany, with its principal place of business in Munich, Germany. Emirat's business is risk management and related promotional aspects, which include commercial promotions and sweepstakes.

---

[1]Unless identified by a citation or otherwise noted, the following facts are from the parties' stipulated facts (Doc. 61) or are quoted from stipulated exhibits attached to that document.

2

Defendant High Point Printing LLC was an Ohio limited liability company with its principal place of business in Aurora, Ohio. High Point's two members were citizens of Ohio and Pennsylvania. (Doc. 18 at 1–2.) However, High Point has not appeared in this action and has filed a Certificate of Dissolution with the Ohio Secretary of State on April 19, 2013. Prior to its dissolution, High Point was a commercial printer and print broker. Doug Szygenda was an owner and its principal agent.

Defendant WS Packaging Group, Inc., is a Wisconsin corporation with its principal place of business in Green Bay, Wisconsin. It manufactures printing and packaging products, including labels, tags, coupons, decals and game and sweepstakes printed products.

In the summer of 2007, a Dubai-based company introduced Emirat to Sabafon, a telephone services company based in Yemen, which led to a contract between Emirat and Sabafon for the printing of 25 million scratch-off phone cards. The scratch-off phone cards were intended to be purchased by consumers so they could get a prepaid activation code (a "PIN ") for their telephones. The PIN on each card was to be covered by an opaque scratch-off coating.

The scratch-off phone cards would also include a promotional scratch-and-win game, which consisted of twenty-four boxes with a range of prizes also covered by scratch-off coating. According to the rules of the promotional game, if a player scratched six boxes that revealed the same prize, the player would win that prize. If the six boxes scratched off showed more than one prize or more than six boxes were scratched off, the player would get nothing. Every card had six boxes containing the same prize, and the remaining boxes had various other prizes; thus, each card was a potential winner.

3

On June 7, 2007, Emirat issued a quote to Sabafon for "25,000,000 high level EMIRAT Security Cards." The name "high level EMIRAT Security Cards" was a marketing term used by Emirat in the quote. The quote provided no further description of the level of security necessary for the cards, however it did indicate that "[t]he scratch cards have to be printed through EMIRAT." It is undisputed that Sabafon accepted the quote.

On each card, the chances that a player would pick the correct six boxes to scratch were small. The contract between Emirat and Sabafon detailed what percentage of cards would have the possibility of winning each level of prizes. Additionally, there were to be ten "guaranteed" grand prize winners on which all twenty-four boxes had the same prize of a car—thus a guaranteed win.

Emirat is not a printing company, and prior to its contract with Sabafon it had been involved with only one project involving the printing of scratch-off cards. Under the contract between the two companies, Emirat agreed to arrange for the printing of the 25 million scratch-off cards as requested. Initially, Sabafon agreed to pay Emirat an amount that included the cost of printing the cards and the cost of the prizes. Emirat assumed all responsibility for the prizes and agreed to obtain insurance for the prizes.

At some point representatives of Emirat contacted High Point regarding obtaining the scratch-off cards. Then, on or about March 28, 2008, Andrea Bargholz and Stephanie Sohr of Emirat and Doug Szygenda of High Point visited WS Packaging's Neenah, Wisconsin, plant and discussed WS Packaging's ability to print the cards. According to Bargholz, at this initial meeting, a WS Packaging employee represented that WS Packaging

4

could print the cards securely.  (Doc. 57, ¶ 1.[2])  According to Szygenda, at some point Susan Rohde of WS Packaging assured Szygenda that WS Packaging "was up to the job." (Doc. 57, ¶ 2; Doc. 59 Ex. 3 at 28.)

On May 6, 2008, Emirat obtained a quote from High Point regarding the printing of the 25 million scratch-off cards (also called "scratch-and-reveal cards" or "scratch-n-reveal cards" or "game cards" in the evidence and this opinion) with overwrap.  On May 9, 2008, Emirat accepted the quote, entering a contract with High Point.  (Doc. 61 Ex. 2.)  Nothing in the quote or acceptance of the quote referenced WS Packaging in any way.  (Doc. 61 Ex. 2.)

The High Point quote as accepted by Emirat contained no reference to card security or "high-level EMIRAT Security Cards."  (Doc. 79 Ex. L at 46–47; Doc. 75, additional ¶ 1; Doc. 87, ¶ 1.)  According to Emirat's Ralph Martin, "we all assumed that everybody understands the same talking about secure prepaid phone cards, so there was—to us there was no need to specify, I mean, any written—down written standards."  (Doc. 79 Ex. A at 70.)

Martin of Emirat and Szygenda of High Point visited WS Packaging's plant in Neenah on May 20, 2008, to "address and see revisions made to graphics from original 2nd press proof."  WS Packaging's Sue Rohde listed both High Point Printing's Szygenda and Emirat's Martin on a "Customer Visit Form."  (Doc. 61, Ex. 3; see Doc. 57, ¶ 3.)  The form is a standard frm to document visits by any outside parties.  (Doc. 76, ¶ 3.)

---

[2]WS Packaging does not dispute that Bargholz so says, but the company disputes the credibility and accuracy of Bargholz's statement.  (Doc. 75, ¶ 1.)

On May 23, 2008, High Point and WS Packaging entered a Letter of Indemnification agreement, stating among other things, that WS Packaging "assumes responsibility only for the accuracy of the printing" and states that WS Packaging does not "guarantee that a game construction cannot be tampered with, counterfeited or foiled." By its terms, the May 23, 2008 Letter of Indemnification covered game orders submitted by High Point to WS Packaging from May 2008 to June 2009. (Doc. 63, ¶ 3; Doc. 61 Ex. 4 at 1.) (The letter's contents are further discussed below.) WS Packaging says that the Letter of Indemnification was required to allow WS Packaging to properly price and perform the work requested by High Point and that WS Packaging would not have been willing or able to perform the contemplated work without the Letter of Indemnification. (Doc. 63, ¶ 4.)

Emirat's Martin and High Point's Szygenda again visited WS Packaging's Neenah plant on June 6, 2008, to "address and see revisions made to graphics from original 3rd press proof." WS Packaging's Rohde again listed Martin and Szygenda on a "Customer Visit Form" (Doc. 61, Ex. 6; *see* Doc. 57, ¶ 3.)

Thereafter, High Point subcontracted with WS Packaging to print the cards. WS Packaging provided a quotation to High Point on September 16, 2008, for printing 25 million scratch-n-reveal cards. (Doc. 61 Ex. 7.) High Point then submitted a purchase order on September 23, 2008, to WS Packaging for 25 million "Scratch-N-Reveal" cards to be delivered to Yemen. Under the High Point/Emirat and WS Packaging/High Point contracts, the cards were to be folded in half and sealed individually in a clear plastic overwrap. On September 23, 2008, Emirat's Martin signed off on proofs and provided minor changes and suggestions for the cards to be printed by WS Packaging.

6

In preparation for another plant visit by Martin and Szygenda, WS Packaging's Rohde referred to both men as the "customer." (Doc. 59, Ex. 12; *see* Doc. 57 ¶ 3.) And on September 26, 2008, Martin and Szygenda again visited WS Packaging's plant in Neenah to observe printing and approve the press run, and for Martin to take certain pieces back with him. According to WS Packaging's Greg Braun, Szygenda went over what WS Packaging was going to do and how the company would do it, and Martin was the decision-maker who was able to sign off on a run. (Doc. 51, Ex. 1 at 73; *see* Doc. 57, ¶ 4.) WS Packaging admits that as High Point's customer, Emirat was ultimately responsible for providing direction on the project to High Point and, by extension, WS Packaging. (Doc. 75, ¶ 4.) While at the Neenah plant, Martin signed two agreements drafted by WS Packaging regarding the "High Point Printing Phone Card Project," releasing, indemnifying and holding harmless WS Packaging relating to "Destruction of Spoilage and Product Overages" and the approval of the "Number of Winning pieces."

At deposition, WS Packaging's Paula Hagen defined "candling" as "[s]how-through of game data." (Doc. 59 Ex. 10 at 28.) She agreed that a card is considered candled if someone "is able to read a significant portion of either the game data or the phone charge code." (Doc. *id.* at 79.) WS Packaging's Mark Kraftzenk defined "candling" as "using a light source through the construction to determine a prize value on the card." (Doc. 59 Ex. 2 at 144.) WS Packaging's Brad Miller defined "candling" as being able to "make out the image underneath the scratch-off." (Doc. 59 Ex. 6 at 30.) WS Packaging's expert, Jim Carides, agreed with a "candling" definition of the ability to see the game data through the scratch-off ink or through layers of paper with a high-intensity light source. (Doc. 58 Ex. 8 at 135.)

Pursuant to its contract with High Point, WS Packaging printed an initial run of 12.5 million cards and delivered them to Yemen in October 2008. Upon delivery of the first shipment of cards in October 2008, WS Packaging's Rohde emailed Bargholz of Emirat and Szygenda of High Point, inquiring about Emirat's address in Munich, Germany for the FedEx of a CD containing scratch-off card data.

A few weeks after the initial run of 12.5 million cards was shipped, Emirat contacted Szygenda at High Point to report that Sabafon had complained that "the pin numbers are readable with a light behind the card (candling) [sic]." Szygenda relayed that complaint to WS Packaging. WS Packaging requested that High Point return the 12.5 million scratch-off cards printed during the initial run of cards in 2008 and issued a return authorization, indicating that "[g]ame data is visible under the scratch off area on some cards when a high intensity light is flashed through the back of the card." WS Packaging's Hagen sent an email to WS Packaging's quality-management and customer-relations teams on November 12, 2008, discussing, among other things, the new equipment to be used for testing candling of scratch-off cards.

Although WS Packaging agreed to reprint the cards at no charge, Emirat communicated to High Point a number of changes to the cards' configuration. (Doc. 63, ¶ 8; Doc. 81 ¶ 8.) On February 11, 2009, WS Packaging issued a new quote to High Point for the reprinting of the cards; the quote reflected the requested changes. (Doc. 63, ¶ 8; Doc. 81 ¶ 8.)

On April 30, 2009, WS Packaging and High Point entered a second Letter of Indemnification containing nearly identical terms to the May 2008 Letter of Indemnification. By its terms, the April 30, 2009 Letter of Indemnification covered game orders submitted

8

from April 2009 to May 2010.  (Doc. 63, ¶ 3; Doc. 61 Ex. 5 at 1.)  On May 21, 2009, WS Packaging's Kevin Fitzgerald emailed "game notes" to colleagues, stating that "GAME CARD MUST NOT CANDLE WHEN USING STRONGEST LIGHT BEAM WE HAVE IN HOUSE!!!"  (Doc. 59 Ex. 19.)

On May 27, 2009, High Point issued a new purchase order to WS Packaging for 25 million scratch-n-reveal cards for a total remaining cost of over $700,000.  The new purchase order likewise reflected the changes requested by Emirat.  (Doc. 63, ¶ 9; Doc. 81, ¶ 9.)  Pursuant to the revised purchase order, WS Packaging printed proofs of the new scratch-off cards.  Those proofs were provided to Emirat, and Emirat gave them to its customer, Sabafon.  On June 1, 2009, Emirat emailed High Point to notify it that Sabafon had inspected the proofs.   Two days later Emirat forwarded the email to Hagen at WS Packaging.

Before WS Packaging began production of the second run of cards (the first run of the "re-run"), Emirat requested that WS Packaging send sample cards to an independent lab for testing.  Emirat identified and selected the third party testing facility:  Force Technology in Denmark.  It also selected the testing methods to be used by Force Technology and communicated those testing methods to High Point as well.  Neither the WS Packaging/High Point nor the High Point/Emirat contract specifically called for such testing.  WS Packaging asked Emirat to execute an authorization form authorizing WS Packaging "to send 25 un-voided live game pieces to Force Technology" for testing.

When Force Technology was asked to check for "candling," Force Technology's employees did not know what that meant.  (Doc. 79 Ex. G at 11.)  But Force Technology tested nine sample cards provided to it by conducting the five tests chosen by Emirat:  light

9

penetration (by both daylight and fluorescent tube), UV light, thermal imaging, x-ray, and laser light. On June 2, 2009, Ole Bundgaard of Force Technology reported to Emirat that Force Technology had successfully run the security tests requested by Emirat and that "[t]he preliminary conclusion is, that it is not possible—with the techniques used—to disclose the symbols underneath the scratch layer." On June 3, 2009, Emirat's Martin forwarded this preliminary conclusion to WS Packaging.

On June 3, 2009, Martin signed the WS Packaging Variable Image Proof and Games Checklist, affirming, among other things, that the card layout, color, graphics, and "candling"/"see thru" of game data with the green variable imaging ink had been reviewed and approved and that a statement or confirmation from Force Technology had been received. On June 4, 2009, Force Technology issued a report that concluded "based on the cards received and the tests done on the cards, that the symbols can not be disclosed and the security of the scratch card game 'Match Win' is good."

Force Technology received additional sample cards on June 11, 2009, for more security testing. Force Technology employed the same security tests identified in its June 4, 2009, report, as requested by Emirat, and once again concluded based on these same tests that "the symbols can not be disclosed and the security of the scratch card game "Match Win" is good." Force Technology issued a report with its conclusions on June 25, 2009.

After Emirat approved the sample cards and proofs, WS Packaging proceeded to press startup for the second run of cards. WS Packaging internal job production instructions dated July 24, 2009, state, among other things, that "THERE CAN BE NO CANDLING—USE HIGH INTENSITY LIGHT. PRODUCT HAS BEEN TESTED BY 3RD

10

PARTY TESTING LAB IN DENMARK." (Doc. 59 Ex. 20.) WS Packaging's instructions regarding testing of the game cards called for two cards to be checked for candling using a high-intensity light, every half hour, commencing at start-up and ending at shut-down. (Doc. 57 ¶ 18; Doc. 59 Ex. 22.)

According to WS Packaging employees, for a secure printing job, "zero" candling "is the level that you need to have," candling on the Emirat job was not acceptable, and the specifications for the Emirat job indicated that there could be no candling. (Doc. 59 Ex. 1 at 52, 65, Ex. 10 at 78–79, Ex. 6 at 177.)

The candling testing done by WS Packaging on the production line consisted of using a high-intensity light to see if the tester could see what was printed behind the scratch-off layer. (Doc. 57, ¶ 8.) During production, WS Packaging checked the Emirat game cards for candling using Scorpion flashlights, pulling "retains" at intervals during the manufacturing process. (Doc. 79 Ex. 4 at 57–58.) It checked the game cards on the press-room floor and in a quality lab by holding the light beam behind the game-card data. (*Id.* at 58.) A run of approximately 10 million cards by WS Packaging was printed and shipped at the end of July 2009.

WS Packaging may have bent the cards a little over a flashlight during that testing. (Doc. 59, Ex. 11 at 128; *see* Doc. 57, ¶ 9; Doc. 75, ¶ 9.) Emirat's Sarah Spannagel watched WS Packaging test cards during one of the runs and said at deposition that WS Packaging personnel bent the cards "a little" over a flashlight, though she also testified that she could not recall specifically what WS Packaging personnel were doing and questioned the meaning of "bend." (Doc. 59, Ex. 11 at 128, 150; Doc. 79, Ex. F at 33.) On the other hand, WS Packaging's Greg Braun has declared that

11

[f]or scratch-off printing jobs like the High Point Project, it is WS Packaging's normal process to document a standard for the manner in which those cards will be tested for candling, including the frequency with which product retains will be pulled for examination during the production process. When testing scratch-off cards for cards along the production line, WS Packaging shines a high-intensity light beam behind the cards to determine whether the secure printing can be revealed, but WS Packaging does not bend or manipulate the cards in any way during that process. WS Packaging demonstrated this protocol for testing for candling for its customer High Point, as well as Emirat.

(Doc. 76, ¶ 4.) WS Packaging's Hagen averred at deposition that the company's internal documents "would have stated no candling if viewed under agreed-upon procedures . . . what we would agree upon is not candling if viewed under some high-intensity light source." (Doc. 79 Ex. D at 17.)

According to High Point's Szygenda, WS Packaging knew that Emirat was High Point's customer but that WS Packaging was printing the cards for Emirat. (Doc. 75, ¶ 4; Doc. 59 Ex. 3 at 37.) Also, according to Szygenda, throughout 2009, Emirat became more involved in dealing directly with WS Packaging and Szygenda and High Point became less involved. (Doc. 59 Ex. 3 at 37.) For instance, Hagen at WS Packaging emailed Andrea Bargholz of Emirat and Szygenda of High Point on May 15, 2009, requesting confirmation of "prize spreading" requirements for the printing project. Bargholz then emailed Kelly Amundson of WS Packaging May 26, 2009, with printing specifications and a request that the specifications be printed and given to Szygenda. On June 5, 2009, Hagen emailed Martin and Spannagel at Emirat enclosing a document that "summarizes [WS Packaging's] packaging process." Karen Naze at WS Packaging reported to other WS Packaging personnel on August 5, 2009, regarding conversations with Emirat employees about payments for the next two shipments. And on August 13, 2009, WS Packaging's Greg Braun wrote to Bargholz at Emirat regarding new payment dates, and Bargholz responded

12

a few days later, indicating that Emirat would pay WS Packaging after Emirat was paid in full by Sabafon. (Doc. 57, ¶ 28; Doc. 59 Ex. 27.) WS Packaging agrees that by the first run of the re-run, WS Packaging was dealing with and emailing Emirat as well as High Point and that Martin of Emirat was the decision-maker able to sign off on the run of cards because that was how Sygenda "wanted it to work." (Doc. 59 Ex. 1 at 73; Doc. 79 Ex. D at 36 (Hagen stating that "it became direct communication [with Emirat] at some point midway through 2009" at Szygenda's request).)

High Point ceased operations sometime in late 2009. (Doc. 59 Ex. 3 at 15.)

When the July 2009 shipment reached Sabafon, Sabafon told Emirat that the cards were not in numerical order and that there were not 500 cards in each tray. Further, Emirat became aware that some of the cards could not be found in a serial number database that WS Packaging had provided with the cards. On July 26, 2009, Emirat's Martin emailed Braun atof WS Packaging regarding Emirat's concerns with the sequencing of the cards already shipped.

Over the next several months, WS Packaging, High Point, and Emirat negotiated a Settlement Agreement that was executed on October 23, 2009. The Settlement Agreement indicated, among other things, that a dispute had arisen between the parties concerning certain matters, including numerical sequencing of the game cards, and that the parties agreed to settle the dispute "to avoid litigation and related expenses, without admission of liability." (Doc. 61 Ex. 32 ¶¶ C, D.) Under the Settlement Agreement, WS Packaging agreed to issue to High Point, who in turn agreed to issue to Emirat, a credit toward the invoices for the next shipments of scratch-off cards. (The terms of the Settlement Agreement are discussed more fully below.) Simultaneous with the execution of the

13

Settlement Agreement, WS Packaging and Emirat executed an Escrow Agreement with JP Morgan Chase, N.A. as escrow agent, to provide "an available source of funds . . . to compensate [WS Packaging] for the delivery of the Cards."

Representatives of Emirat were present at WS Packaging's plant in Neenah on October 23, 2009, to inspect the next shipment of cards and arrange for their shipment to Dubai. Upon execution of the Settlement Agreement, on October 23, 2009, the next shipment of approximately 7.5 million cards was sent to Dubai. The cards printed in 2009 contained an expiration date of December 31, 2010. (Doc. 63, ¶ 7.)

Again, Force Technology was provided samples of cards for testing, according to the same testing protocol selected by Emirat and used previously. On October 30, 2009, Force Technology issued a report concluding that "based on the cards received and the tests done on the cards, that the symbols can not be disclosed and the security of the scratch card game 'Match Win' is good."

The October 23rd shipment of cards reached Dubai in November. Bargholz and Spannagel of Emirat were present in Dubai, along with representatives of Sabafon. Spannagel has testified that she and Barholz observed a representative of Sabafon use a flashlight to candle a game card and successfully scratch off six matching symbols out of twenty-four. (Doc. 57k, ¶ 32; Doc. 75, ¶ 32.) Bargholz and Spannagel have testified that, upon examination of some of the cards with an ordinary household flashlight, they were able to see phone-card PINs. When Spannagel and Bargholz tested the game cards in Dubai, they bent the cards, cracking the scratch layer, though the cracks could not be seen by the naked eye. (Doc. 79 Ex. F at 102.)

14

On November 17, 2009, Bargholz and Spannagel prepared a spreadsheet of some cards from the delivery made to Dubai in October 2009 that they claimed they were able to read by examining the cards with a flashlight. However, Emirat no longer has possession or control of the cards listed in that document.

On November 17, 2009, Emirat contacted Force Technology, stating that "[b]y checking some more cards randomly we came across some cards which seemed to be not secure," and further stating that Emirat wanted "to inform you in the upfront that you are not surprised why we are sending cards again." Emirat requested that Force Technology test additional sample cards. Emirat's Spannagel made a video and sent it to Force Technology showing Force Technology how to do Emirat's new test. In the video, she bent a game card around a flashlight (similar to bending it around a pencil). (Doc. 79 Ex. F at 101–02.)

On November 18, 2009, Emirat's Martin emailed Braun and Hagen at WS Packaging stating that the second delivery of cards did not pass security. WS Packaging's Mark Kraftzenk at some point examined the "retains" kept by WS Packaging for candling and was able to identify some numbers from PINs on a couple of cards and all fourteen numbers of the PIN on two cards without removing the scratch-off material. However, no one from WS Packaging could candle any of the game symbols on the cards. (Doc. 57, ¶ 35; Doc. 75, ¶ 35; Doc. 61 Ex. 39.) Hagen told Braun that "[t]here were only 2 pieces that Mark Kraftzenk could see all the numbers in the serial number but he could not at any time candle any of the game data."

On November 24, 2009, Emirat's Spannagel emailed Susann Geschke and Ole Bundgaard of Force Technology stating that "our client already told us that he is not

accepting the cards. What we need right now is an official report which says that the cards are not secure." Force Technology performed the additional testing requested by Emirat, including the same tests used during its previous examinations of the cards, which the cards again passed. Force Technology then used the new method shown in the video from Emirat, which Force Technology called the "torch light" test. Prior to this additional testing at the request of Emirat, Geschke and Bundgaard had never performed or heard of the torch-light test. Bundgaard described the torch-light test as removing the scratch-off card from its sealed wrapper and "bend[ing] it over a pencil, not bending, but in a manner so that it's possible to repeat—repeat the test in the same way. And then you will use Mag lights, or the torch, on the back side of the card in a dark room, and look from different angles, changed the angle of the light, looking at different angles. And in this way it was possible to look, see through, but look underneath the scratch layer." (Doc. 57, ¶ 38; Doc. 59 Ex. 5 at 100.)

On December 3, 2009, Force Technology issued a new report concluding that fifteen sample cards tested passed all five previous tests: daylight, fluorescent tube, UV light, thermal imaging, x-ray and laser light, and that neither the PINs nor the prize symbols of the cards could be disclosed under those techniques without destroying the scratch layer. However, the report further indicated that when the additional torch-light or high-intensity light test was employed the "figures could be disclosed by the 'torch light test'" and that "examination leaves the scratch layer intact, i.e., no damage can be seen with the naked eye." The report described the torch-light test as follows:

> The scratch cards are carefully bended around a pencil without destroying the scratch layer and afterwards the scratch layer of the recharge code is examined by shining through the card from the backside with the help of a

16

focussed [sic] torch light (the bulb of a smal MAGLITE), to check if the numbers of the rechard code can be read through the scratch layer. This test is done in a dark room.

(Doc. 61, Ex. 41 at 2.) And according to the report,

[t]he careful bending of the scratch card around a pencil results in a "cracking" of the recharge scratch layer. The result of this manipulation is that on some cards the green type underneath the scratch layer becomes visible, while shining through the recharge scratch layer from the backside and bending the card around the bulb. It was possible with the naked eye to read the numbers of the recharge code through the scratch layer. The examination leaves the scratch layer intact, i.e. no damage can be seen with the naked eye. It is also found that the quality of the scratch layer is varying between the individual cards, and it seems to be easier to see through the scratch cards starting with number 800 0037 6620 than it is on the other two series because there are already many pinholes present in the recharge scratch layer on series 800 0037 6620, which makes it easier to see the recharge code. It was not possible to document the disclosure of the numbers on a photo. The human eye is better in disclosing the green numbers than a photo is.

(Doc. 61, Ex. 41 at 2.) Force Technology concluded that "the security of the scratch card game 'Match Win' is thus considered not to be good." (*Id.*)

Emirat paid High Point a total sum of over $700,000 for the printing of the scratch-off cards at issue in this case. WS Packaging was paid a lesser sum by High Point for this project. Emirat never made any payments directly to WS Packaging for any scratch-off cards or for any other purpose. Emirat has not received a refund of any amounts it paid to High Point in connection with the game-card project. (Doc. 57, ¶ 44; Doc. 75, ¶ 44.)

According to WS Packaging's expert, Jim Carides, scatch-off material ages and becomes brittle and "generally [has] a one year or less shelf life for the most part." (Doc. 79 Ex. B at 178.) Carides first saw the game cards at issue in 2014. (Doc. 80 Ex. 6 at 181.) He was able to identify fragments of up to three or four numbers or one full digit of a PIN on certain cards. However, in his opinion the security of that card would not be

17

considered compromised. (Doc. 59 Ex. 8 at 130, 144, 165.) Moreover, it took Carides six hours using a fiberoptic light to find one digit of one PIN. (Doc. 59 Ex. 8 at 144.) Carides has opined that the cracking from bending in the cards he tested was most likely the result of the age of the cards. (Doc. 79 Ex. B at 180.)

Emirat's expert James Blanco was asked to use the torch-light method after bending the cards. (Doc. 79 Ex. I at 53.) It took Blanco thirteen or fourteen hours to "hone" a method of getting good enough at bending the game cards such that they could be candled but flattened back out to look like they had not been bent. (*See* Doc. 79 Ex. I at 72.) Blanco says he was able to identify all fourteen numbers of a PIN and some game symbols without removing any of the scratch-of coating and leaving the card looking "clean" such that a person would not know it had been bent during the torch-light method. (Doc. 57, ¶ 40; Doc. 59, Ex. 9 at 148.)

Emirat's expert Larry Stewart testified at deposition that when he had the game cards flat on a light box or other test, "it did not work as far as being able to read through it. It wasn't until I began rolling it and bending it and putting intense light behind it, and you can't do that on a flat box . . . ." (Doc. 79 Ex. J at 105.) Stewart concluded after inspecting the cards in 2014 that the game cards were "not secure and can be easily compromised with a readily available light source." (Doc. 57, ¶ 42; Doc. 75, ¶ 42; Doc. 59 Ex. 30.) Stewart indicated that he started with other testing methods before he found the bending technique that worked. But after figuring out what to do "it would take me five minutes to do that test" and he could do it "rapid fire." (Doc. 86 Ex. 2 at 121–22.) Stewart stopped testing once he saw portions of printing and did not decipher an entire PIN, as "[t]hat would take many more hours than I was provided here." (Doc. 79 Ex. J at 117.)

18

Stewart and Blanco conceded that the game cards were not a security risk according to the World Lottery Association standard under which a scratch-off ticket would be a security risk only if it could be compromised in less than five minutes. (Doc. 75, ¶ 16; Doc. 87, ¶ 16.)

## DISCUSSION

This case is in federal court based on diversity jurisdiction, as the parties are citizens of different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. The parties agree that Wisconsin law applies.

The court begins by holding that at the very least there are genuine disputes of material fact as to what the security standard for the cards was and whether the scratch-off cards were defective in consideration of such a standard.

No contract specified the security level required for the game cards. Emirat agreed to provide Sabafon with "high level security" cards without defining what that meant. Neither the Emirat/High Point contract nor the High Point/WS Packaging contract contained any specific security requirements. Emirat's Martin said he just assumed that everyone would know that the cards had to be secure. But what does "secure" mean? Meeting the World Lottery Association standards? Inability to candle a significant portion of a PIN or game symbol as WS Packaging's Hagen and Carides have indicated? Inability to candle any fragment of any character or symbol as Emirat argues?

Emirat argues that as shown by WS Packaging's internal documents, WS Packaging knew that the standard was "zero" candling. However, WS Packaging's internal quality expectation does not establish what the requirements for security were for purposes of the contracts. And even "zero" is ambiguous here—zero cards as a whole being

19

compromisable or zero fragments of characters being descipherable?  Does a secure card require inability to candle the card when flat or after bending and cracking (or more aggressive manipulation)?  WS Packaging, which printed such scratch-off tickets, checked flat game pieces, as did Force Technology when doing the first five tests *Emirat* requested. Force Technology had never heard of or seen the torch-light test prior to the video it received from Emirat.  Also, the Letters of Indemnification (further discussed below) disclaimed any liability for cards that were manipulated.

And importantly, whether the cards could be candled under Emirat's purported standard is in dispute.  Retains tested on the line and in WS Packaging's quality lab seem to have passed the Scorpion-light tests.  Emirat approved Force Technology's testing of the cards using five different tests, with the cards dry and wet, and the sample cards passed all of those tests at least twice.  Only after Emirat employees *directed* Force Technology to report that the cards could be candled did Force Technology do so.  And only after Emirat or Force Technology employees bent or otherwise manipulated the cards, cracking the scratch-off material (though not visible to the naked eye), were the cards able to be candled.

Experts have indicated that the cards would be considered secure under the standards of the World Lottery Association.  WS Packaging's expert, Carides, reported that despite his aggressive efforts to compromise the cards using a variety of techniques, he could not reveal complete PINs or game symbols so as to compromise the security of the Cards, and it took him hours to do that.  (Doc. 59 Ex. 8 at 130.)  Further, the testing by Emirat's experts, performed after the scratch-off material aged for several years, does not definitely determine that the cards as delivered could be candled under any possible

20

standard. Thus, unless the resolution of other issues makes trial unnecessary, a jury would have to decide whether the cards as delivered could be candled. As a consequence, Emirat's motion for summary judgment must be denied and the court turns to other dispositive matters.[3]

A.    Breach of contract claims

1.    The Settlement Agreement argument

Emirat's primary argument for liability is that WS Packaging breached their Settlement Agreement by providing defective scratch-off cards. The Settlement Agreement is the only agreement to which WS Packaging and Emirat are parties, and it is to be interpreted in accord with Wisconsin substantive law. (Doc. 61 Ex. 32, ¶ 11.)

Under Wisconsin law, the court's goal in interpreting a contract is to ascertain the intentions of the parties as expressed by the contractual language. *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, ¶ 33, 793 N.W.2d 476, ¶ 33; *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 259 (1990). When the terms of a contract are clear and unambiguous, the court construes the contract according to its literal terms. *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998). Contracts should be construed according to their plain or ordinary meaning. *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, ¶ 52, 716 N.W.2d 807, ¶ 52. Contracts should be interpreted to avoid absurd results. *Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶ 2, 351 Wis. 2d 123, ¶ 2, 839 N.W.2d 425, ¶ 2. Contract

---

[3]In addition, Emirat's discussions indicate that the damages, if Emirat were to win, are not fixed or readily determinable, but contain amounts such as lost profits that a jury would have to decide, such that prejudgment interest would not be appropriate.

language should be construed to give meaning to every word, avoiding constructions that render portions of the contract meaningless, inexplicable, or mere surplusage.  *Kasten v. Doral Dental USA, LLC*, 2007 WI 76, ¶ 48, 301 Wis. 2d 598, ¶ 48, 733 N.W.2d 300, ¶ 48. An unambiguous integration clause demonstrates that the parties intended the contract to be a final and complete expression of their agreement.  *See Town Bank*, 2010 WI 134, ¶ 37.

The Settlement Agreement by its terms acknowledged that WS Packaging had already agreed to sell, and High Point had agreed to purchase, 25 million scratch-n-reveal cards and that, in turn, High Point had agreed to sell and Emirat had agreed to buy those cards.  (Doc. 61 Ex. 32 ¶¶ A, B.)  As stated above, the Settlement Agreement noted a dispute had arisen between the parties concerning certain matters and that the parties agreed to settle the dispute to avoid litigation.  (Doc. 61 Ex. 32 ¶¶ C, D.)  Importantly, the Settlement Agreement provided that "[t]he scope of this agreement is strictly limited to the Dispute and the additional matters covered in Sections 5 and 6, below (the 'Additional Matters')."

The Settlement Agreement defined the "Disputed Items," which together constituted the defined term "Dispute," as follows:

> (i) unscanned Cards (Cards bearing official serial numbers that are in trays but that are not referenced in the serial number database); (ii) Cards not being in sequential order in the trays; (iii) incorrect number of Cards in the trays (trays with either more or less than 500 Cards); (iv) the serial number database not matching the Cards in the trays (Cards bearing official serial numbers that have been scanned to be located in a certain tray, but are actually in another tray); and (v) missing serial numbers.

(Doc. 61 Ex. 32, ¶ C.)  The Additional Matters of sections 5 and 6 are as follows, in full:

22

5.  *Numbering of Cards.*  Subject to Emirat's responsibilities set forth in this Section 5, WSPG [i.e., WS Packaging] Entitites agree that they will not ship two or more Cards bearing the same serial number.

With respect to the third shipment of Cards, once WSPG runs out of serial numbers, it will initiate the shipment of those Cards in accordance with Section 6, below.

With respect to the fourth shipment of Cards, Emirat will either (i) provide WSPG with the missing serial numbers (gone missing during the previous Card production runs) to enable WSPG to complete at least 99% of the Card order, or (ii) provide WSPG with both the missing serial numbers and 1,300,000 additional serial numbers.  If Emirat chooses option (i), the resulting Shortfall will be deemed to have been permitted in accordance with the next paragraph.  It is the responsibility of Emirat to ensure that the database provided to WSPG containing the missing serial numbers does not contain duplicated numbers.

In their sole discretion, Emirat and High Point may, at any time, give WSPG permission to ship less than 25 million Cards to Emirat and, if such permission is given, Emirat and High Point agree that WSPG will have no liability for the Card shortfall (the "Shortfall").  If Emirat and High Point choose to permit a Shortfall, Emirat agrees to defend, indemnify and hold the WSPG Entities and the High Point Entities harmless from and against any claims arising directly from the Shortfall that are brought or made by the SabaFon Entities.

6.  *Revised Shipping and Payment Schedule.*  The Parties agree that the first shipment of Cards is in Emirat's possession, the second shipment of Cards is ready to ship from WSPG's facility on any future date specified by Emirat, and the third shipment of Cards will be ready to ship from WSPG's facility twenty-one (21) days after Emirat deposits $284,370 into an escrow account in accordance with the Escrow Agreement entered into between Emirat and WSPG.  The fourth shipment of Cards will be ready to ship from WSPG's facility twenty-one (21) days after Emirat (i) makes available to WSPG the missing serial numbers and/or the additional serial numbers as set forth in Section 5, above, and (ii) deposits $274,016 into the escrow account referenced above.  Notwithstanding the foregoing to the contrary, the third and fourth shipments of Cards will not be released to Emirat unless and until Emirat (after inspection) signs off on the shipments as being in compliance with the product specifications used to manufacture the first shipment of Cards.

In the event a Shortfall does occur (see Section 5, above), the amount due WSPG will be adjusted accordingly.

It is understood that, by paying the above-mentioned amounts into the escrow account, Emirat and High Point will have paid for the Cards in full, absent any changes made by Emirat and/or High Point to Card quantity, specifications, etc.

23

(Doc. 61 Ex. 32.)

The Settlement Agreement contained an integration clause stating "[t]his Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, and supersedes all prior negotiations, representations, and agreements between the parties, either written or oral, with respect to the subject matter hereof."  (Doc. 61 Ex. 32, ¶ 11.)

Emirat argues that "WS Packaging  agreed as part of the settlement agreement to print 15 million additional cards, deliver them to Emirat on a specific schedule, and that [sic] the cards would be printed according to the specifications used for the June 2009 printing." (Doc. 72 at 11.)  Emirat admits that the Disputed Items are not a basis for its claims in this case.  Instead, it focuses on sections 5 and 6, arguing that those sections

> boil down to a promise by WS Packaging, made in exchange for payments by Emirat to print and deliver 15 million more cards printed according to the specifications of the first 10 million that had already been delivered to Emirat. WS Packaging's promise in the Agreement that "the second shipment of Cards is ready to ship from WSPG's facility" is a promise that those cards have been printed properly, accurately, and according to the specifications specifically referenced and incorporated into the agreement.

(Doc. 78 at 7.)  According to Emirat, the Settlement Agreement was a new contract "for which the specifications required no candling."  (*Id.*)

Emirat's reading stretches the Settlement Agreement too far.  The Settlement Agreement covers only the Disputed Items and the Additional Matters in sections 5 and 6. The Settlement Agreement goes no further.  (Doc. 61 Ex. 32, ¶ C, ¶ 11 (stating that the agreement constitutes the entire agreement and supersedes prior agreements only "with respect to the subject matter hereof").)   In the Settlement Agreement, the parties acknowledged that scratch-off game cards were sold and purchased pursuant to two *prior*

24

*contracts*. (Doc. 61 Ex. 32, ¶¶ A, B.) The language in Section 6 indicates that the first two shipments of game cards were produced pursuant to the prior contracts, as the cards had shipped or were ready to ship. By its plain and unambiguous terms, the Settlement Agreement amends or supersedes only the portions of the prior two contracts that relate to the Disputed Items and the matters in sections 5 and 6, and only as set forth in the Settlement Agreement. Otherwise, the prior two contracts remain in place.

The court finds that section 5, like the Disputed Items, provides no basis for the present case. Section 5 concerns eliminating serial-number duplication. WS Packaging agreed in section 5 not to ship cards with serial numbers that duplicated those on other cards. The section then addresses how WS Packaging would use the rest of the serial numbers for shipment three and how Emirat would provide serial numbers or allow a "Shortfall" for shipment four. Nothing in section 5 amends the prior contracts regarding production of the game cards except as to the serial numbers used and when the cards would ship.

Nothing in section 6 supersedes the prior two contracts regarding product specifications. Section 6 concerns the timing of shipments and payments. The *only* portion of this section arguably related to production of the game cards is the sentence stating that notwithstanding the shipping schedule set forth in section 6, the third and fourth shipments would not be released by WS Packaging until Emirat signed off on the shipments as complying "with the product specifications used to manufacture the first shipment of Cards." (Doc. 61 Ex. 32, ¶ 6.) In section 6 the parties acknowledged that the product specifications existed as part of the *prior* contracts and left them alone. The High Point/WS Packaging purchase orders set forth detailed specifications for the game cards, including size, stock,

25

ink color, font, quantity, silver scratch-off coating, folding, and wrapping. (Doc. 61, Exs. 9, 17.)  On the other hand, section 6 did not incorporate those product specifications by reference.  Nor did it alter or amend or supersede them in any way—there is no mention of size, stock, ink, color, manner of folding, wrapping, or other requirements.  Morever, there is no reference to the security of the scratch-off portion of the cards.  This sentence of section 6 simply changed the timing of product shipments to occur after an inspection and approval of the cards by Emirat—whatever the requirements were.  Rather than creating an obligation for WS Packaging, section 6 concerns *Emirat's* conduct.

Emirat's construction of section 6 and the integration clause as creating a new contract between WS Packaging and Emirat for the printing of the cards would render meaningless the language in paragraph C expressly limiting the scope of the Settlement Agreement to the Disputed Items and Additional Matters.  Construing the Settlement Agreement as a modification of the original contracts between WS Packaging and High Point and High Point and Emirat regarding only the sequencing matters in the Dispute and the Additional Matters of numbering, payment, and shipping preserves the meaning of the limitation-of-scope provision.

In short, the Settlement Agreement provides no contractual basis for Emirat's claims about the quality or condition of the game cards.  WS Packaging made no promises in the Settlement Agreement regarding product specifications or quality.  Any promises regarding the product must come from something other than the Settlement Agreement.  Thus, summary judgment must be denied to Emirat and granted to WS Packaging on the Settlement Agreement issue.

    2.      Unilateral contract and implied contract in fact

Emirat argues in the alternative that if the Settlement Agreement does not constitute an agreement between WS Packaging and Emirat regarding the production of the game cards, then WS Packaging created a unilateral contract or an implied contract in fact.

In *Paulson v. Olson Implement Co.*, the Supreme Court of Wisconsin recognized the theory of a unilateral contract, described as existing where only one party has made a promise and only that party is subject to a legal obligation. 107 Wis. 2d 510, 517 n.6, 319 N.W.2d 855, 858 (1982). The court gave as an example "the situation where A says to B, '"If you walk across Brooklyn Bridge, I promise to pay you ten dollars."'A has made a unilateral contract which arises when—and if—B performs the act." *Id.* In *Paulson*, the court found an enforceable unilateral contract made by a manufacturer to exist when an agent of the manufacturer accompanied a middleman to a meeting with buyers, and the agent promised the buyers that his company's grain drying bin would dry their harvest of 5000 bushels of corn within twenty-four hours. *Id.* at 513–14, 518–19. The buyers believed they were dealing with the agent and the middleman, *id.* at 518, and the middleman and manufacturer presented the buyers with a proposal on the manufacturer's form setting forth specifications and cost, *id.* at 513. The court found that the unilateral contract became binding when the buyers signed a sales contract for that specific manufacturer's bin sold by the middleman, providing consideration for a contract between the manufacturer and the buyers. Thus, the parties had privity for a breach of warranty action. *Id.* at 518–19.

Emirat maintains that when its officials on March 28, 2008, visited WS Packaging's plant, WS Packaging employees promised that the company's cards would be more secure than cards Emirat had printed by a different company in Chile and that WS Packaging could

27

"do the job" (Doc. 57, ¶¶ 1, 2.)  According to Emirat, these were unilateral promises that the cards would be secure, and the consideration then provided by Emirat was the contract between Emirat and High Point for the printing job.  (*See* Doc. 85 at 7–8.)  Further, says Emirat, after the return of the initial shipment that could be candled, WS Packaging promised that the re-run would be secure, thereby giving rise to an additional unilateral contract, as Emirat continued with the project and incurred additional expenses.  (*See id.* at 8.)

The present case differs significantly from *Paulson*.  In *Paulson*, the manufacturer's agent provided a very specific guarantee to the buyers, not a general "we can do the job" or "we can do it better than your prior printer" type of statement as occurred here.  Further, the *Paulson* proposal was made on the manufacturer's form and the buyers contracted for the specific item for which the agent had furnished his guarantee, indicating that the buyers were induced by specific promise of the manufacturer to purchase that item.  Here, importantly, Emirat and High Point entered their contract with no reference whatsover to WS Packaging or WS Packaging's printing abilities.  After entering the contract with Emirat, High Point could have looked elsewhere to fulfill its printing requirements for Emirat.  Indeed, High Point did not contract with WS Packaging for another five months.  No reasonable jury would find that the High Point/Emirat contract constituted consideration for or acceptance of a unilateral promise by WS Packaging.  Nor would any reasonable jury find that Emirat's continuation with the project after the return of the initial shipment constituted consideration for creating a unilateral contract based on a subsequent general "promise" that the re-run would be secure.

28

Next, absent a written agreement, the course of conduct between the parties can demonstrate an implied contract in fact. *See Schaller v. Marine Nat'l Bank of Neenah,* 131 Wis. 2d 389, 398, 388 N.W.2d 645 (Ct. App. 1986). An implied contract, like an express contract, requires the element of a mutual meeting of minds and an intention to contract; it is established by proof of circumstances from which the intention of the parties is implied rather than expressed. *See id.* An implied contract in fact arises under circumstances that "according to ordinary course of dealing and common understanding of men, show a mutual intention to contract." *Id.* (internal quotation marks omitted). However, neither mere knowledge of a subcontractor's existence nor contact between a subcontractor and owner establishes an implied contract relationship. *Seegers v. Sprague*, 70 Wis. 2d 997, 1003, 236 N.W.2d 227 (1975).

Here, the actual contracting actions by Emirat and WS Packaging establish the opposite of a mutual intention to contract at the start of and throughout much of their relationship. Emirat appears to be a relatively sophisticated international commercial enterprise—located in Germany, contracting with Sabafon in Yemen and High Point in Ohio and flying employees to Dubai and Neenah. It chose to enter a direct contract with High Point, not WS Packaging, in May 2008. At deposition, Emirat's Martin was asked about WS Packaging and testified as follows:

> Q But at that time when you first met WS Packaging, you had a contractual relationship with High Point and High Point only?
> A Yes.
> Q Okay. Were you familiar at all with the terms of High Point's contract with WS Packaging?
> A Nope.
> Q Did you know what High Point was paying WS Packaging for the printing?
> A Nope.

29

> Q   Did you know if High Point had communicated any security standards
>       to WS Packaging about the printing?
> A   Nope.
> Q   Did you know if High Point's contract with WS Packaging referred to
>       EMIRAT or Sabafon as the customers for the cards?
> A   Nope.

(Doc. 65 Ex. A at 57.) And the Letters of Indemnification and the September 2008 purchase order by High Point fail to mention Emirat, either. The listing of Emirat's employees on a customer visitor form, setting up details of plant visits such as needed conference rooms and lunch, is not enough for a reasonable jury to find a mutual intention to contract.

As additional support for its claims of a unilateral contract or implied contract in fact, Emirat contends that over time High Point started to drop out of the three-party relationship and that WS Packaging and Emirat began working together, and that the original contract transformed into a new contract between WS Packaging and Emirat. But the undisputed written evidence indicates that High Point was still involved as of the time of the Settlement Agreement, and High Point did not stop as a going concern until late 2009 and did not not dissolve until 2013. And when WS Packaging and Emirat intended to contract together, they did so in the Settlement Agreement. Consequently, there is insufficient evidence for a reasonable jury to conclude that a contract-in-fact existed between WS Packaging and Emirat sometime in 2009.

3.     The third-party beneficiary argument

It is undisputed that WS Packaging contracted with High Point through the Letters of Indemnification signed in April 2008 and May 2009 and purchase orders received on September 23, 2008, and May 27, 2009.  Emirat acknowledges that it is not a party to the WS Packaging/High Point contract and that it is not in privity with WS Packaging except through the Settlement Agreement.  But its alternate argument is that it is a third-party beneficiary of the WS Packaging/High Point contract.

A person not a party to an agreement may recover under that agreement as a third-party beneficiary if the agreement was intentionally entered primarily and directly for the benefit of that person.  *Hoida, Inc. v. M&I Midstate Bank,* 2006 WI 69, ¶ 19, 291 Wis. 2d 283, ¶ 19, 717 N.W.2d 17, ¶ 19; *Sussex Tool & Supply, Inc. v. Mainline Sewer & Water, Inc.*, 231 Wis. 2d 404, 409, 605 N.W.2d 620 (Ct. App. 1999).  The contracting parties must intend to grant the third party an enforceable right.  *Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 911 (7th Cir. 1989) (discussing New Jersey and other general contract law).  An indirect benefit incidental to the primary purpose of the contract is insufficient to confer third-party beneficiary status.  *Becker v. Crispell-Snyder, Inc.*, 2009 WI App 24, ¶ 11, 316 Wis. 2d 359, ¶ 11, 763 N.W.2d 192, ¶ 11; *Sussex Tool & Supply, Inc.*, 231 Wis. 2d at 409.  The Seventh Circuit has noted that in various jurisdictions

> courts have also been reluctant to recognize third-party rights based solely on the fact that the contracting parties were aware of the third person's relationship to the transaction. For example, courts have generally held that a third party is not a beneficiary of a sales agreement merely because both contracting parties knew that the product would be resold to the third party, or to a class of which the third party was a member. Even where the subsequent purchaser is mentioned by name in the contract, such a third party is "no more than a known remote buyer" in the absence of further evidence of an intent to benefit the third party.

31

*Corrugated Paper Prods., Inc.*, 868 F.2d at 911.

WS Packaging contends that evidence that the agreement was intentionally entered directly and primarily for the benefit of another must be found within the agreement itself, and the agreements between WS Packaging and High Point did not by its terms confer any benefits on Emirat.  This court disagrees that the written terms of a contract must confer the third-party benefit.  In *Hoida*, the Supreme Court of Wisconsin said that to assert third-party status a plaintiff could attach a copy of a written contract so demonstrating or assert facts sufficient to show a primary and direct benefit.  2006 WI 69, ¶ 19.  In *Becker*, the Wisconsin Court of Appeals found a plaintiff to be a third-party beneficiary of an *oral* contract.  The court found that "the evidence of the oral contract between the town and Crispell-Snyder is not specific enough for us to examine the parties' intent through specific express language.  However, we can use the totality of the circumstances to evaluate whether the contract" conferred a benefit on the Beckers, limited the benefit to a well-defined group, and required the contractor to assume liability to third parties.  2009 WI App 24, ¶ 14 (citing two Supreme Court of Wisconsin cases in which the court determined the parties' intent based on the facts and circumstances surrounding an oral contract).  Further, regarding sales of goods, in particular, for which contracts may consist of multiple documents and the conduct of the parties rather than detailed agreements with integration clauses, it seems reasonable to consider the parties' conduct regarding the contract to determine their intent.  *See* III E. Allan Farnsworth, *Farnsworth on Contracts* § 10.3 (3d ed. 2004) ("[I]f a completely integrated agreement is silent as to intention to benefit, evidence of prior negotiations to show such an intention should not be admitted because it would, in effect, be used to add a term.  If the agreement in only paritally integtated, however, the

32

evidence should probably be admitted on the ground that the additional term would be consistent. If the agreement is not integrated, there is no reason to refuse to admit the evidence.").

Whether Emirat was and is a third-party beneficiary of the May 2009 purchase order is an interesting question, as Emirat's representatives were a part of the order process throughout the High Point/WS Packaging relationship relating to this case, the purchase order mentions Emirat as responsible for shipping, and Emirat thereafter controlled the testing of the game cards. Notwithstanding the lack of any express writing confirming or denying Emirat's position as a third-party beneficiary, the parties' actions indicate that toward the end of the relationship regarding these scratch-off game cards Emirat was involved almost as much as High Point in the ordering process. And in *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶ 31, 283 Wis. 2d 606, ¶ 31, 699 N.W.2d 189, ¶ 31, the Supreme Court of Wisconsin left open the question whether an owner could sue a subcontractor when a general contractor is insolvent.

On the other hand, Emirat might not be considered an intended beneficiary under the Restatement (Second) of Contracts § 302 (1981), as WS Packaging's performance of the production contract would neither satisfy an obligation of High Point to pay money to Emirat nor serve as a gift to Emirat. *See id.* cmts. And two of the Restatement's illustrations suggest that if the promisee acts as an intermediary, the third party is at most an incidental beneficiary. *See id.* illustrations 3, 19 ("A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building."). The author of *Corbin on Contracts* suggests that Emirat would not be

considered a third-party beneficiary: "While a few cases recognize an owner as a third party beneficiary under a contract between the general contractor and subcontractor, the case law generally supports the view espoused in this treatise that the owner is typically not an intended beneficiary of such contracts." 9 John E. Murray, Jr., *Corbin on Contracts* § 45.3 (rev. ed. 2007). And the Seventh Circuit in *Corrugated Paper Products, Inc.* seemed to agree, as set forth above.

But this court need not decide whether Emirat is a third-party beneficiary, because, even if so considered, its rights extend no further than the terms of the contract itself. The third-party "beneficiary's rights are defined and limited by the contract that created those rights." 9 Murray, *supra*, § 46.5; *accord* III Farnsworth, *supra*, § 10.9 ("Since an intended beneficiary's (C's) right is based on the contract between the promisor (A) and the promisee (B), it is measured by the terms of that contract and is generally subject to any defenses and claims of the promisor against the promisee arising out of that contract."). A promisor may assert against a third-party beneficiary any defense that it could assert against the promisee. *See* Restatement (Second) of Contracts § 309 cmt. c. (1981) (stating that the beneficiary's right, like that of an assignee, "is subject to limitations inherent in the contract, and to supervening defenses arising by virtue of its terms").

And here the terms of the contract indicate that Emirat failed to sue within the contractual statute of limitations. The WS Packaging and High Point contract consists of the terms contained in the Letters of Indemnification, the quotes from WS Packaging to High Point, and the High Point purchase orders. High Point's Szygenda signed the Letters of Indemnification, agreeing to the Letters in their entirety. (Doc. 61 Ex. 4 at 7, Ex. 5 at 7.) The Letters state that their purpose was "to confirm WSPG's role in the execution of these

34

game orders and to establish the rights and obligations of the parties with respect thereto."

(Doc. 63, ¶ 5; Doc. 61 Ex. 4 at 1, Ex. 5 at 1.)  The letters then continue:

> Seller agrees to provide the Products to Buyer only on these terms and conditions, notwithstanding any language in Buyer's purchase order, if one exists, or other writing or oral representation previously, simultaneously or hereafter received by Seller purporting to amend, modify or replace these terms, covenants and conditions with any different or additional terms, covenants or conditions or reciting that any action or inaction by Seller constitutes agreement or consent by Seller to such amendment, modification or replacement.  SELLER'S AGREEMENT TO PROVIDE THE PRODUCTS IS EXPRESSLY CONDITIONED ON BUYER'S ASSENT TO ALL OF THE TERMS AND CONDITIONS SET FORTH HEREIN.

(Doc. 61 Ex. 4, ¶ 1, Ex. 5, ¶ 1.) And importantly, the Letters include the following provision, in all-caps bold:  "ANY ACTION BROUGHT BY BUYER MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE DELIVERY OF THE PRODUCTS OR THE COMPLETION OF SERVICES NOTWITHSTANDING ANY STATUTORY PERIOD OF LIMITATION TO THE CONTRARY."  (Doc. 61 Ex. 4, ¶ 18, Ex. 5, ¶ 18.)

The first shipment of replacement game cards was in Emirat's possession in the summer of 2009, and certainly before execution of the Settlement Agreement on October 23, 2009, and the second shipment went out shortly after the Settlement Agreement was executed and was received by Emirat in Yemen in November 2009. Therefore, any claim about the condition or defective quality of those two shipments of cards had to be brought no later than one year after receipt—November 2010.  Emirat filed this case on August 2, 2012, which was too late according to the Letters of Indemnification.

Emirat argues that the statute of limitations has not run, because the limitations provision provides for a time period of one year after delivery of the products *or completion of services*, and WS Packaging has not completed its services inasmuch as third and fourth

shipments remain outstanding. The limitations provision does not specify delivery of the products or the completion of services, *whichever comes earlier* or *whichever comes later*. So the court must interpret the language as written. As such, it finds that claims about the deliveries that were already made had to be brought within one year of each delivery. Thus, Emirat's lawsuit was still filed too late respecting the cards that were actually delivered.

That leaves possible claims regarding the unshipped cards. As to those, Emirat ignores the fact that the third and fourth shipments were contingent on Emirat's payment of deposits into the escrow account, which did not occur, and Emirat's approval of the shipments as compliant with product specifications, which also did not occur. At some point after the second shipment was deemed unacceptable by Emirat it became clear that Emirat would not deposit funds into the escrow account or approve further shipments. Although the parties have not argued about that date, the court finds that the evidence to which they have stipulated provides an answer as to the latest possible date. According to its terms, the Escrow Agreement terminated "upon (a) the distribution and transfer of the Escrow Fund and interest as provided by the terms of this Agreement or (b) December 31, 2010 if Emirat does not deposit the Escrow Fund with the Escrow Agent, in each case unless sooner terminated by written agreement of Emirat and WSP." (Doc. 61 Ex. 33, ¶ 4.) Thus, as Emirat did not deposit the funds by December 31, 2010, WS Packaging's services were complete as of that date. Thus, Emirat had to sue regarding shipments three and four no later than the end of 2011.

B.      Breach of warranty claims

The Letters of Indemnification state:

36

As a manufacturer, and not a games administrator, WSPG assumes responsibility only for the accuracy of the printing and seeding of the game and only as provided herein. Any activities related to games administration (including but not limited to game design; legality of the game or its rules; or guarantee that a game construction cannot be tampered with, counterfeited or foiled) are not the responsibility of WSPG, and WSPG hereby rejects responsibility or obligation for any and all activities or requirements related thereto.

Game orders are sold with the understanding that you will test product samples under their actual conditions of use before placing an order. WSPG will provide you with samples to conduct the necessary tests. You are solely responsible to determine the suitability of the products for their intended use, and accept all risk and liability whatsoever in connection with such decisions.

(Doc. 63, ¶ 6; Doc. 61 Ex. 4 at 1, Ex. 5 at 1.) Further, the Letters state:

10. *Limited Warranty.* Seller warrants to Buyer that its Products will be produced according to Buyer's written specifications and requirements, which have been agreed to in writing by Seller, and that its Products will be free from material defects in workmanship and materials under normal use and service, for a period of six (6) months from the date of Seller's delivery of the Products to the Delivery Point. There is NO WARRANTY in cases of damage in transit, negligence, abuse, abnormal usage, misuse, accidents, altered Products, failure to follow Seller's instructions or improper storage. Seller shall further be responsible for producing the correct number of game pieces and, when Buyer does not have a representative present, the accurate seeding of the game and for complying with Seller's established procedures for production, seeding and security of the game order. The foregoing warranty is in lieu of all other warranties, expressed or implied, including but not limited to warranties of merchantability and fitness for a particular purpose. Seller's liability under this warranty is limited to damages directly resulting from breach of this warranty; provided that in no case or circumstances shall Seller be responsible for damages in excess of $1,000,000 (USD). For defective products, Seller's sole and exlcusive obligation (and Buyer's sole and exclusive remedy) under this warranty shall be, upon prompt written notice received by Seller during the Warranty Period of any breach, to either, at Seller's option, repair, correct or replace wihtout charge, F.O.B. Seller's facility, any defective Product expressly warranted herein by Seller against defects and found by Seller in its sole discretion to be defective and covered by this warranty, or credit Buyer for the purchase price paid for such Product. Seller shall not be liable to Buyer, or to anyone claiming under Buyer, for any other obligations or liabilities, including but not limited to, obligations or liabilities arising out of breach of contract or warranty, negligence or tort or any theory of strict liability, with respect to the

37

Products or Seller's acts or omissions or otherwise.  Under no circumstances shall Seller be liable for incidental or consequential damages of any kind arising out of a breach of warranty or otherwise.

11.  *Limited Liability*.  Prior to using Products, Buyer or user shall determine the suitability of the Product for the intended use and Buyer shall assume all risk and liability whatsoever in connection therewith.  IN NO EVENT SHALL SELLER BE LIABLE FOR INCIDENTAL, INDIRECT, COMPENSATORY, PUNITIVE, CONSEQUENTIAL, SPECIAL OR OTHER DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS.  SELLER'S AGGREGATE LIABILITY WITH RESPECT TO A DEFECTIVE PRODUCT AND THIS LETTER AND/OR ANY QUOTATION, ACKNOWLEDGMENT OR INVOICE ISSUED FROM SELLER TO BUYER SHALL BE LIMITED TO THE MONIES PAID BY BUYER TO SELLER FOR THE DEFECTIVE PRODUCT. FOR ANY OTHER BREACH OF WARRANTY, BUYER'S TOTAL RECOVERY SHALL BE LIMITED TO THE SUM OF $1,000,000 (USD) FOR DAMAGES DIRECTLY INCURRED.  The remedy described in this *section 11* is Buyer's exclusive remedy and is in lieu of any other remedy otherwise available at law or by contract.

12.  *Disclaimer of Warranties.*  SELLER AND BUYER AGREE THAT THE WARRANTY IN *SECTION 10* IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES WITH RESPECT TO THE PRODUCTS FURNISHED BY SELLER HEREUNDER (INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRINTING OR REPRODUCTION OF UNIVERSAL PRODUCT CODE INFORMATION).  SELLER HEREBY DISCLAIMS AND EXCLUDES ALL OTHER EXPRESS OR IMPLIED WARRANTIES.  Any oral or written description of the Products is for the sole purpose of identifying the Products and shall not be construed as a warranty.

(Doc. 61 Ex. 4, ¶¶ 10, 11, 12, Ex. 5 ¶¶ 10, 11, 12.)

Through this language, WS Packaging disclaimed not once, but twice, any implied warranties of merchantability and fitness for a particular purpose and any liability for incidental or consequential damages.  WS Packaging warranted that the game cards would be produced according to High Point's written specifications and requirements; the game cards would be free from material defects in workmanship and materials under normal use and service for six months after delivery; and WS Packaging would produce the correct

38

number of game cards, accurately seed the game, and comply with established procedures for production, seeding and security. Further, regarding defective products WS Packaging limited any possible remedies to replacement of the game cards or reimbursement of the price paid.

Thus, even if Emirat were a third-party beneficiary, it would have only the limited warranty set forth in the Letters. And as to that warranty the statute of limitations in the Letters of Indemnification would apply. Moreover, even if Emirat had sued in a timely manner, its damages would be limited.

C.      Equitable claims

1.      Unjust enrichment

Unjust enrichment is a quasi-contractual theory based in equity; it applies only in the absence of a contract. *Greenlee v. Rainbow Auction/Realty Co.*, 202 Wis. 2d 653, 671 , 553 N.W.2d 257 (Ct. App. 1996). Emirat did not have a contract for goods with WS Packaging, but it did have one with High Point. Wisconsin caselaw suggests that the existence of either the Emirat/High Point or High Point/WS Packaging contract precludes Emirat's claim of unjust enrichment even though the contract was not between Emirat and WS Packaging. *See Gebhardt Bros. v. Brimmel*, 31 Wis. 2d 581, 585, 143 N.W.2d 479 (1966). That case involved an attempt by a subcontractor to obtain payment from the owner of property after failing to obtain payment from the general contractor. The Supreme Court of Wisconsin found that an owner is not liable on an implied contract simply because he received some benefit if there was an express contract between the contractor and subcontractor; "a subcontractor must resort for payment to the principal contractor and not

39

to the owner of the property." 31 Wis. 2d at 585–86. However, the same would likely be true in the reverse scenario of a buyer attempting to recover from the subcontractor.

But an even more fundamental problem causes Emirat's claim to fail. An unjust enrichment claim requires (1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation or knowledge by the defendant of the benefit, (3) acceptance or retention by the defendant of the benefit, and (4) circumstances that make it inequitable for the defendant to retain the benefit without payment of its value. *See Major Mat Co. v. Monsanto Co.*, 969 F.2d 579, 585 (7th Cir. 1992). Here, Emirat conferred no benefit on WS Packaging. Any payment WS Packaging received for production of the game cards came from High Point, not Emirat. Emirat may have paid High Point, but it did not pay WS Packaging. Any benefit to WS Packaging of the Emirat/High Point contract, entered months before High Point submitted its purchase order or paid WS Packaging, was indirect at most.

### 2. Promissory estoppel

To prevail on a claim of promissory estoppel under Wisconsin law, a plaintiff must establish that (1) the defendant made a promise that he should reasonably have expected to induce action or forbearance by the plaintiff, (2) the promise did induce action or forbearance by the plaintiff, and (3) injustice can be avoided only by enforcement of the promise. *Major Mat Co.*, 969 F.2d at 582–83; *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 694–96, 133 N.W.2d 267 (1965); *McLellan v. Charly*, 2008 WI App 126, ¶ 50, 313 Wis. 2d 623, ¶ 50, 758 N.W.2d 94, ¶ 50. The first two elements are questions of fact, but the third is a question of policy left to the court. *Major Mat Co.*, 969 F.3d at 583.

40

"Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. Where there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) (discussing Wisconsin law). Again, although there is no direct contract for production of the cards between Emirat and WS Packaging, the three parties' use of two contracts governed their relationships. Thus, it appears that there is no gap for promissory estoppel to fill here.

Further, "a promise is a manifestation of intent by the promisor to be bound, and is to be judged by an objective standard. Mere predictions or statements of opinion are not promises supportive of a promissory estoppel cause of action." *Major Mat Co.*, 969 F.3d at 583. The promise must be definite. *All-Tech Telecom, Inc.*, 174 F.3d at 868. "A promisee cannot be permitted to use the doctrine to do an end run around the rule that puffing is not actionable as misrepresentation . . . ." *Id.* at 869.

Here, Emirat argues that WS Packaging promised Emirat a certain number of cards that could not be candled and that WS Packaging could "do the job" better than Emirat's prior vendor. (Doc. 85 at 15.) The court believes that a reasonable jury could reach only one reasonable conclusion regarding any statement by WS Packaging employees that their company could "do the job" and do it better than another company: it was a mere prediction or statement of opinion. As for a promise of a certain number of cards that could not be candled, the statements preceding Emirat's purchase order with High Point are not specific enough to be "promises" regarding number or security, and Emirat contracted with

41

High Point before WS Packaging made more specific "promises" in any quote to High Point. Thus, Emirat cannot establish that any of WS Packaging's later statements induced action by Emirat.

Further, even assuming for argument's sake that these constituted clear and definite promises rather than sales puffery, the court finds no support for the third requirement of avoiding injustice. Emirat had a contractual claim against High Point. Emirat could have brought that claim earlier, before High Point went out of business. That High Point may not be able to pay any claim by Emirat does not make denial of a promissory estoppel claim against WS Packaging unjust.

D.      Negligence claim

The economic loss doctrine bars the purchaser of a product for recovery on a tort theory for damages that are solely "economic." *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶ 6, 283 Wis. 2d 606, ¶ 6, 699 N.W.2d 189, ¶ 6. "Economic damages are those arising because the product does not perform as expected, including damage to the product itself or monetary losses caused by the product" as opposed to personal injury or damage to other property. *Id.* The doctrine preserves the distinction between contract and tort law when a product fails in its intended use and injures only itself, causing damages that can be addressed by contract as opposed to personal-injury damages that are unexpected. *See id.* ¶ 7.

The economic loss doctrine applies in the situation of the ultimate purchaser and a subcontractor. *See id.* generally. The pertinent contract is that between the purchaser and the general contractor. *Id.* ¶ 17. Permitting the purchaser to maintain a tort claim against

42

the subcontractor would allow the purchaser to avoid the warranties and remedies the purchaser and general contractor bargained for. *Id.*

Here, Emirat contracted with High Point for game cards, and High Point then subcontracted with WS Packaging. Emirat sues for only economic losses. Allowing Emirat to sue WS Packaging in tort would undermine the distinction between contract law and tort law and violate the economic loss doctrine. *See id.* Thus, Emirat's final claim must be dismissed.

CONCLUSION

Therefore,

IT IS ORDERED that Emirat's motion for partial summary judgment (Doc. 71) is denied and WS Packaging's motion for summary judgment (Doc. 68) is granted.

Dated at Milwaukee, Wisconsin, this 29th day of March, 2017.

BY THE COURT

    /s/                        

C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE

Case 2:12-cv-00789-CNC   Filed 03/29/17   Page 43 of 44   Document 94